UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PEDRO SOLORIO TORRES, | ) | 1:04-CV-5804 OWW SMS HC |
| | ) | |
| Petitioner, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS |
| | ) | |
| | ) | |
| A. A. LAMARQUE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

On May 1, 2002, Petitioner was convicted in the Tulare County Superior Court by jury trial of second degree murder in violation of Cal. Penal Code § 187, one count of gross vehicular manslaughter while intoxicated in violation of Cal. Penal Code §191.5(a), driving while under the influence causing injury in violation of Cal. Vehicle Code § 23153(a), driving with a blood alcohol level over the legal limit causing injury in violation of Cal. Vehicle Code § 23153(b), leaving the scene of an accident in violation of Cal. Vehicle Code § 20001(a), and misdemeanor driving without

a license in violation of Cal. Vehicle Code § 12500(a). See Lodged Doc. No. 1[1]. On June 13, 2002, Petitioner was sentenced to a total indeterminate term of 22 years to life in state prison.

Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District (hereinafter "Fifth DCA"). Id. On October 8, 2003, the Fifth DCA reversed the conviction on count two, gross vehicular manslaughter while intoxicated, and ordered the sentencing court to amend the abstract of judgment. Id. In all other respects, the judgment was affirmed. Id.

On November 4, 2003, Petitioner filed a petition for review in the California Supreme Court. See Lodged Doc. No. 4. The petition was summarily denied on January 14, 2004. See Lodged Doc. No. 5.

On June 9, 2004, Petitioner filed the instant federal petition for writ of habeas corpus in this Court.  The petition presents the following two (2) grounds for relief: 1) Petitioner contends there was insufficient evidence to support the conviction of second degree murder; and 2) Petitioner claims the appellate court erroneously decided that sentencing error did not affect Petitioner's sentence.

Respondent filed an answer to the petition on February 28, 2005. Respondent concedes the petition is exhausted. Petitioner filed a traverse on March 21, 2005.

## FACTUAL BACKGROUND[2]

During the early evening hours on October 18, 2001, four teenagers approached an intersection in Dinuba. It was dark at the time. Artemio N. testified he, his sister Kelly N., and stepbrother Jonathan B., were walking their friend Amber A. home. The foursome entered a crosswalk at Alta Avenue. Each of the four looked both ways before crossing the street. The four then proceeded into the crosswalk with Jonathan and Kelly walking sided by side three to five feet in front of Artemio and Amber. While crossing the street, Artemio noticed a van approaching the intersection without its headlights on. He yelled out to Kelly to watch out when the van struck both Kelly and Jonathan. As a result of the impact, Jonathan was thrown some distance, landing on his

---

[1] "Lodged Doc." refers to the documents lodged by Respondent.

[2] The factual summary of the case is derived from the opinion of the Fifth DCA of October 8, 2003.

1  head in the street. Kelly was dragged underneath the van for approximately one quarter of a mile
2  until the driver of the van pulled over.
3      Police and paramedics arrived minutes after the accident. Jonathan, who was unconscious
4  and bleeding from his head, was lying with his head on the sidewalk and his body in the street.
5  Officer Rubalcaba shook Jonathan to wake him. When he awoke, Jonathan began screaming and was
6  in obvious pain. He was subsequently taken to the hospital by helicopter. Jonathan suffered from a
7  concussion and was hospitalized from one to two weeks after the incident. Kelly subsequently died
8  from her injuries. According to the pathologist, the cause of death was a basilar skull fracture from
9  blunt force trauma.
10     Maria Lopez was shopping at a farmers' market when she noticed a van drive up with a girl
11 being dragged under it. The van stopped a few feet from Lopez, who observed a man exit the
12 vehicle. Lopez immediately called for an ambulance and went to attend to the girl. The driver of the
13 van stood near her and seemed scared. Subsequently, the man disappeared.
14     Officer Manuel Romero responded to the scene. He noticed the van parked and its engine
15 running in the street with Kelly lying in front of it. No one was inside of the van, and Romero began
16 looking for witnesses and the driver. Romero contacted Lopez who gave him a description of the
17 man driving the van. Shortly after receiving the description, Romero scanned the crowd and spotted
18 Petitioner. Romero testified that he had scanned the crowd earlier and had not seen Petitioner. Lopez
19 identified Petitioner as the driver of the van.
20     Petitioner admitted to Romero that he had been driving the van and stated that he drank one
21 beer prior to driving. In addition he stated that he did not have a driver's license. Petitioner stated he
22 thought he had hit something while he was driving, but he was unsure of what it was. He explained
23 that he did not pull over right away because he wanted to move his van out of the road. Romero
24 testified that there were numerous places to pull over in the quarter mile between the crosswalk
25 where the children were struck and where the van finally came to rest.
26     Romero conducted four field sobriety tests upon Petitioner, all of which Petitioner failed.
27 Petitioner was arrested and given a breathalyzer test approximately two hours after the accident.
28 Petitioner registered blood alcohol levels of .15 and .14 percent. Blood was also drawn from

Petitioner after his arrest. The result from the blood test indicated Petitioner had a blood alcohol level of .13. Extrapolating backwards, the toxicologist testified that Petitioner had a blood alcohol level of .17 percent at the time of the accident.

After his arrest, Petitioner spoke with officer Robert Esquibel. Petitioner admitted to drinking three 16-ounce beers prior to driving. He stated that he drank the beers at his daughter's house after 5:00 p.m. Petitioner stated that he had been driving home from his daughter's house, traveling at about 35 miles per hour, when he hit someone. According to Petitioner, he struck one victim near the farmers' market. He felt a "bang" and then heard another "bang" underneath his vehicle. Petitioner then pulled over at the farmers' market to see what he had struck. At that point, he noticed someone pinned under the van, so he backed the van up to free the person. Petitioner denied hitting the victim near the crosswalk.

The prosecution was allowed to introduce evidence relating to Petitioner's prior arrests for drunk driving. On January 8, 1996, Petitioner pulled over near a man parked on the side of the road. A highway patrol officer stopped to determine if the men needed assistance. Upon approaching, the officer noticed Petitioner appeared to be under the influence of alcohol. After failing several field sobriety tests, the officer arrested Petitioner for driving while intoxicated. The officer gave Petitioner a breathalyzer test, and Petitioner registered blood alcohol levels of .17 and .18 percent.

On December 23, 1997, a number of sheriff's deputies were redirecting traffic near a crime scene. Two parked patrol cars, one marked and one unmarked, were blocking traffic with their light bars activated. Deputies were standing in the street redirecting traffic with flashlights. Petitioner failed to reduce his speed while driving toward the deputies. The deputies shined their flashlights at Petitioner and shouted at him to stop, but Petitioner continued driving toward them. Two of the deputies were forced to jump out of the way to avoid being hit by Petitioner. Petitioner continued driving, struck an unmarked patrol car, and stopped a short distance later. After Petitioner's vehicle came to rest, the deputies performed three field sobriety tests upon Petitioner, all of which he failed. Petitioner was arrested for driving while intoxicated; his blood alcohol level was later determined to be .21 percent.

On January 24, 1999, Petitioner was again arrested for drunk driving. A highway patrol

officer observed Petitioner weave across the center line and stop four feet past a stop sign. The officer arrested Petitioner after he failed three field sobriety tests. Petitioner's blood alcohol level was later determined to be .27 percent.

Two days later, a citizen observed Petitioner driving recklessly. Petitioner suddenly stopped in traffic, almost causing an accident, and then proceeded to drive off, weaving on and off the road in heavy traffic. The citizen was amazed that Petitioner did not hit another car. Petitioner continued driving in such a manner for four to five miles. When Petitioner stopped his vehicle, the citizen parked blocking Petitioner's car and notified the highway patrol of Petitioner's conduct. An officer subsequently arrived and administered field sobriety tests which Petitioner failed. Petitioner was arrested for drunk driving and his blood alcohol level was later determined to be .26 percent.

On June 13, 1999, a highway patrol officer stopped a car on suspicion of drunk driving. Petitioner was sleeping in the backseat. The officer awoke Petitioner, but it took him several minutes to do so. The officer attempted to perform field sobriety tests, but Petitioner was not able to stand up long enough to complete the tests. The officer arrested Petitioner because he determined Petitioner was too drunk to take care of himself.

On July 25, 2001, a police officer stopped Petitioner after receiving a report that he was possibly driving while intoxicated. Upon stopping Petitioner, the officer noticed Petitioner had an open beer in the center console. Petitioner failed four field sobriety tests and was arrested for drunk driving. Petitioner had a blood alcohol level of .23 percent on that occasion.

On each occasion Petitioner was arrested for driving while intoxicated, he did not have a driver's license and gave the officers different names and dates of birth. According to the probation officer's report, Petitioner had failed to appear on each of his prior cases.

**Defense case**

Petitioner did not testify on his own behalf. An accident reconstructionist testified that based upon the location of certain pieces of evidence and blood, the victims were 31 feet outside of the crosswalk at the point of impact.

See Lodged Doc. No. 4.

**DISCUSSION**

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II. Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

1    As a threshold matter, this Court must "first decide what constitutes 'clearly established
2 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
3 *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court
4 must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time
5 of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly
6 established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by
7 the Supreme Court at the time the state court renders its decision." Id.

8    Finally, this Court must consider whether the state court's decision was "contrary to, or
9 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,
10 *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the
11 writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
12 question of law or if the state court decides a case differently than [the] Court has on a set of
13 materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.
14 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state
15 court identifies the correct governing legal principle from [the] Court's decisions but unreasonably
16 applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

17    "[A] federal court may not issue the writ simply because the court concludes in its
18 independent judgment that the relevant state court decision applied clearly established federal law
19 erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A
20 federal habeas court making the "unreasonable application" inquiry should ask whether the state
21 court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

22    Petitioner has the burden of establishing that the decision of the state court is contrary to or
23 involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,
24 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,
25 Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court
26 decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th
27 Cir.1999).

28    AEDPA requires that we give considerable deference to state court decisions. The state

court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**

    **A.  Ground One**

In his first ground for relief, Petitioner argues there was insufficient evidence to support the conviction for second degree murder. He contends the evidence failed to demonstrate Petitioner knew the dangers of driving while intoxicated.

In reviewing sufficiency of evidence claims, California courts expressly follow the Jackson standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979). See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

Sufficiency claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324 n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597 (1981).

This claim was first presented on direct appeal to the Fifth DCA. On October 8, 2003, the Fifth DCA denied the claim in a reasoned opinion. Petitioner then presented the claim in a petition for review to the California Supreme Court. The petition was summarily denied on January 14, 2004, without comment or citation of authority. The California Supreme Court, by its "silent order"

denying review of the 5th DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the 5th DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In reviewing Petitioner's claim, the appellate court found there was ample evidence to support the jury's finding. The court analyzed Petitioner's claim as follows:

> As appellant acknowledges, a death caused by a drunk driver may be prosecuted as second degree murder on a theory of implied malice. (*People v. Watson* (1981) 30 Cal.3d 290, 296-299.) A second degree implied malice murder conviction is supported where the defendant deliberately commits an act, the natural consequences of which are dangerous to life, with the knowledge of dangers to life and a conscious disregard of those dangers. (*Id*. at p. 300.) This is a subjective standard that requires that the defendant actually appreciated the risk involved. (*Id*. at pp. 296-297.)
>
> In *People v. Talamantes* (1992) 11 Cal.App.4th 968, 973, the court listed a number of factors courts have relied upon in upholding drunk driving murder convictions: "(1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." Appellant concedes the first factor was met, but argues no evidence supports the remaining three factors. As to his intent to drive, appellant contends the evidence merely established that he had driven to his daughter's house and was on his way home when the incident occurred. There was no evidence, he claims, that he intended to drive while inebriated. As to his knowledge of the dangerousness of driving while intoxicated, he notes that he had never been convicted of driving under the influence and therefore never attended any of the mandatory educational classes that instruct on the dangers of drunk driving. Furthermore, he claims that his prior arrests for drunk driving taught him that he was able to drive while intoxicated without causing any injury. Finally, he argues there was no evidence establishing any dangerous driving during the incident.
>
> Initially, we note that appellant in fact drove with a blood alcohol level well above the legal limit. The toxicologist testified that appellant's blood alcohol level was .13 percent when tested after the accident. Based on this result, the toxicologist was able to determine that at the time of the accident, appellant had a blood alcohol level of .17 percent, more than twice the legal limit. In order to reach such a level, one would have had to consume eight to ten 12-ounce beers.
>
> Regarding appellant's predrinking intent to drive, we find sufficient evidence to satisfy this factor. Appellant consistently drank before driving on the occasions of his five prior arrests, as well as on the day of the incident. In each instance appellant drank enough to elevate his blood alcohol level well above the legal limits. In *Watson*, the court noted that the defendant drove to a bar, drank until he was intoxicated, and must have known that he would drive later. (*People v. Watson, supra*, 30 Cal.3d at p. 300.) As in *Watson*, appellant drove his vehicle to his daughter's home where he drank substantial amounts of alcohol, and he must have known he would drive later that evening. Thus, the evidence was sufficient to support a finding appellant harbored a predrinking intent to drive.
>
> Appellant spends the bulk of his argument contending that the evidence failed to establish he had knowledge of the hazards of driving while intoxicated. Appellant distinguishes other drunk driving murder cases by noting that the defendants in those cases had previously been convicted of driving while intoxicated and therefore had knowledge of the danger of drunk driving. Unlike drivers who have previously been convicted of driving under the influence, appellant had never been required to attend any educational classes outlining the dangers of drunk driving. In addition, he argues that there was no evidence he

"knew from prior mishaps the deadly danger of drunk driving." A review of the evidence establishes sufficient evidence was presented demonstrating appellant knew of the dangers of driving while intoxicated.

Appellant is correct in his assertion that many drunk driving murder cases place emphasis on the fact that the defendant had previously been convicted of drunk driving. (See, e.g., *People v. Autry* (1995) 37 Cal.App.4th 351, 359 [appellate court explained the jury could infer the defendant knew of the dangers of driving while intoxicated from the fact he had previously been convicted for the offense, even if he had not attended any educational classes]; *People v. David* (1991) 230 Cal.App.3d 1109, 1115 ["Prior convictions and exposure to mandatory educational programs are admissible to show the accused's awareness of the life threatening risks of driving under the influence"]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 533-534 [evidence sufficient to demonstrate appellant knew of dangers of driving while intoxicated where defendant had four previous convictions for drunk driving had [] repeatedly been exposed to educational courses].) Although appellant had not attended any classes informing him of the dangers of driving while intoxicated, other evidence was introduced allowing the jury to infer appellant knew of the dangerousness of his actions.

The prosecution introduced evidence that established appellant had been arrested five times for driving under the influence. Although appellant had never suffered a conviction, and therefore never attended any educational classes regarding the dangers of drunk driving, his prior driving was sufficient to alert him to the dangers of driving while intoxicated. During one incident, appellant was observed by a citizen to be driving recklessly. Appellant suddenly stopped in traffic almost causing a collision. He drove away and proceeded to weave from the road and into a dirt shoulder for four or five miles. The citizen followed appellant, amazed that he did not cause a collision. When appellant stopped, the citizen parked, blocking appellant's vehicle. Appellant was arrested for driving while intoxicated and was found to have a blood alcohol level of .26 percent.

On another occasion, appellant struck a parked car and narrowly avoided hitting two sheriff's deputies. Appellant approached a street that had been closed by police conducting an investigation. An unmarked police car was parked, blocking the street with its rear amber lights activated. In addition, a marked police car was parked nearby with its red and blue lights flashing. Two sheriff's deputies stood in the street redirecting traffic with flashlights. Appellant drove toward the deputies, without slowing, and ignored the officers' shouts. The deputies had to jump out of the way to avoid being struck by appellant. Appellant proceeded to hit the parked patrol car and continued driving a short distance. When appellant stopped, officers conducted field sobriety tests, which appellant failed. He was arrested for driving while intoxicated. Subsequent testing revealed appellant had a blood alcohol level of .21 percent.

These incidents were certainly sufficient to alert appellant to the dangers of driving while intoxicated. Appellant had previously struck a parked vehicle, narrowly avoided hitting two deputies, and driven recklessly while intoxicated. Courts have concluded that such behavior is sufficient to inform a driver of the dangers of driving while intoxicated. (*People v. Murray* (1991) 225 Cal.App.3d 734, 745, 747 [defendant's prior blackout while driving, and his reckless driving leading to the accident, including driving the wrong way on the freeway, and numerous near collisions, was sufficient to inform him of the risk of driving while intoxicated]; *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1849-1850, disapproved on other grounds by *People v. Sanchez* (2001) 24 Cal.4th 983 [facts of the defendant's prior driving while intoxicated arrests, including driving into oncoming traffic, demonstrated the dangers of driving while intoxicated to the defendant].)

The facts of this case are not unlike those present in *People v. David, supra*, 230 Cal.App.3d at page 1109. In that case, while driving under the influence of PCP, the

> defendant ran a red light and struck another vehicle, killing both occupants. (*Id*. at p. 1112.) The trial court admitted evidence establishing the defendant had two prior convictions for driving under the influence of PCP. During one incident, the defendant drove through an intersection that had been closed by police. The intersection was marked with flares and police cars with activated lights. The defendant traveled through the intersection at a high rate of speed, almost striking an officer. Officers gave chase and the defendant drove the wrong way down the street, pursued by officers until he struck a tree. (*Ibid*.) In another incident, the defendant collided with a parked car while under the influence of PCP. (*Id*. at pp. 1112-1113.) In discussing whether the defendant knew of the dangers of driving while under the influence, the court explained that the dangers were made clear to the defendant from his prior experience of driving under the influence. (*Id*. at p. 1115.)
>
> Likewise here, appellant's prior actions while driving under the influence of alcohol were sufficient to alert him to the dangers of drunk driving. Appellant had been arrested five times for drunk driving, and in one instance he almost struck two deputies and collided with a parked vehicle. The jury was entitled to infer that such actions informed appellant that driving while intoxicated presented a danger to life.
>
> Regarding the fourth *Talamantes* factor, highly dangerous driving, appellant argues that he did not execute any dangerous driving maneuvers prior to striking Jonathan and Kelly. The evidence established appellant was driving without headlights, although it was dark outside, and was traveling at 35 miles per hour at the time of the incident. Appellant argues that such evidence failed to demonstrate appellant was engaged in any dangerous driving on the night of the incident. Initially we note that Artemio testified that he heard the sound of squealing tires just before entering the crosswalk, indicating that appellant was driving in reckless manner. However, even if we were to agree there was no evidence presented at trial regarding dangerous driving on the night of the incident, we note that not all of the *Talamantes* factors need to be present to sustain a conviction of second degree murder. (*People v. Olivas* (1985) 172 Cal.App.3d 984, 989.) Here, the first three factors set forth in *Talamantes* were strongly supported by the evidence. Accordingly, we find sufficient evidence supports the jury's verdict.

See Lodged Doc. No. 1.

The state court's determination was not unreasonable. As discussed above, under California law a defendant may be found liable for second degree murder for a death caused by drunk driving on a theory of implied malice. See People v. Watson, 30 Cal.3d 290, 296-99 (1981). Implied malice may be found where a defendant deliberately commits an act, the natural consequences of which are dangerous to life, with the knowledge of dangers to life and a conscious disregard of those dangers. Id. California courts have relied on the following four factors in upholding drunk driving murder convictions: "(1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." People v. Talamantes, 11 Cal.App.4th 968, 973 (1992). Here, the state courts reasonably found sufficient evidence supported all four factors.

Petitioner was tested and found to have a blood-alcohol level of .13 percent. The toxicologist

determined Petitioner had a blood alcohol level of .17 percent at the time of the incident, which is more than twice the legal limit. Therefore, the first Talamantes factor was met.

In addition, there was sufficient evidence to find Petitioner had a predrinking intent to drive. He drove to his sister's house and then consumed 96 to 120 ounces of beers knowing he would have to drive. His actions were consistent with his prior occasions of drunk driving where he would consistently drink enough to elevate his blood alcohol level well above the legal limit before driving. Thus, the state court reasonably found there was sufficient evidence to support the finding Petitioner had a predrinking intent to drive.

There was also ample evidence from which it could be found Petitioner knew the hazards of drunk driving. Petitioner had been arrested five times before this incident for drunk driving. In one case, Petitioner nearly hit two sheriff's deputies when he proceeded rapidly through an area closed off by police, despite the warnings of flashing lights from police vehicles, flashlights waved at Petitioner by the deputies, and shouts by the deputies warning Petitioner. After the deputies jumped out of the way, Petitioner collided with a police vehicle. In another instance, Petitioner almost caused an accident and then wove on and off the roadway for approximately four to five miles nearly hitting other vehicles until a citizen placed his car in a position to block Petitioner so he could not drive further and cause an accident. Suffice it to say, for a citizen to take such action Petitioner must have been driving incredibly dangerously. In light of these harrowing instances of drunk driving, it was reasonable for the state courts to find sufficient evidence that Petitioner knew the hazards and dangers to life caused by his drunk driving.

As to the fourth factor, there was sufficient evidence to find Petitioner drove dangerously during the underlying incident. Petitioner drove without his headlights even though it was dark. There was testimony that he drove in such a manner as to lose traction and "squeal" his tires. Therefore, the state court reasonably found sufficient evidence supporting this factor as well.

Accordingly, the rejection of this claim by the state courts was neither contrary to or an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim should be denied.

**B.  Ground Two**

In his second and final claim for relief, Petitioner contends the appellate court erred in finding no sentencing error occurred despite determining that certain sentencing factors used by the trial court were improper.

As pointed out by Respondent, Petitioner does not show how the adjudication of this claim by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, . . . or resulted in a decision that was based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254.  Petitioner does not allege a violation of the clearly established federal law as determined by the Supreme Court. This claim is therefore not cognizable in a federal habeas corpus action. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").

In addition, the appellate court's rationale was not unreasonable:

> Although the trial court relied upon some improper factors in imposing the upper term, we find a remand for resentencing in this case unnecessary. It is well settled that when "a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper." (*People v. Price* (1991) 1 Cal.4th 324, 492.) As we have already explained, the trial court relied upon one proper aggravating factor. A single factor in aggravation will support imposition of an upper term. (*People v. Cruz* (1995) 38 Cal.App.4th 427, 433.)
>
> Prior to sentencing appellant, the trial court explained this was "one of the most tragic criminal cases that has ever come before the Court." In addition, the court noted that appellant's conscious disregard for the safety of the community is most reprehensible." In sentencing appellant to the upper term on court three, the trial [court] stated it recognized appellant's counsel's "position concerning defendant's remorse; however, I find the allegation or assertion by defendant and his attorney to be of little weight." Furthermore, we note that neither the probation report nor the trial court noted any applicable factors in mitigation in this case. Considering the trial court's comments, and the lack of mitigating factors, we find no reasonable probability that the trial court would have imposed a lesser sentence had it known some of its enumerated aggravating factors were improper. Thus, remand for resentencing is not necessary.

See Lodged Doc. No. 1.

Accordingly, the state court rejection of this claim was neither contrary to or an unreasonable

application of clearly established Federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. <u>See</u> 28 U.S.C. § 2254(d). This claim should also be denied.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    October 16, 2007**         /s/ Sandra M. Snyder
                                       UNITED STATES MAGISTRATE JUDGE